**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THE YPSILANTI COMMUNITY
UTILITIES AUTHORITY and
THE CHRISTMAN COMPANY,

               Plaintiffs,                    CASE NO. 07-CV-15280

-vs-

                                    PAUL D. BORMAN
MEADWESTVACO AIR                 UNITED STATES DISTRICT JUDGE
SYSTEMS, LLC, MEADWESTVACO
CORPORATION and BIOCLIMATIC
AIR SYSTEMS, LLC,

               Defendants.
_____/

**OPINION AND ORDER**
**(1) DENYING DEFENDANT MEADWESTVACO CORPORATION'S MOTION FOR**
**SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF**
**CIVIL PROCEDURE 56 AND**
**(2) DENYING DEFENDANT BIOCLIMATIC AIR SYSTEMS, LLC'S F/K/A**
**MEADWESTVACO AIR SYSTEMS, LLC'S MOTION FOR SUMMARY JUDGMENT**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56**

      Now before the Court are Defendant Meadwestvaco Corporation's ("MWV") and Defendant

Bioclimatic Air Systems, LLC's f/k/a Meadwestvaco Air Systems, LLC's ("BAS") Motions for

Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  A hearing was held on

December 10, 2009.  For the following reasons, the Court DENIES MWV's Motion for Summary

Judgment and DENIES BAS' Motion for Summary Judgment.

**I.**      **BACKGROUND**

      This case involves Ypsilanti Community Utilities Authority's ("YCUA") purchase from

Meadwestvaco Air Systems, LLC ("MWVAS") of an air purification system designed to control

1

odor at the YCUA wastewater treatment plant in Ypsilanti, Michigan. The original contracting parties were MWVAS (a joint venture between MWV and Bioclimatic, Inc.) and YCUA (through its general contractor, the Christman Company ("Christman")). YCUA asserts in its Third Amended Complaint (1) that the equipment has never performed to specification; (2) that it entered into the contract with MWVAS based upon the fraudulent representations of both MWV and MWVAS that they were one and the same corporate entity and that the contract guarantees were backed by the financial and technological strength of MWV; (3) that had YCUA known, when it signed the contract in January 2005, that MWV was withdrawing from MWVAS, it would not have signed the contract; (4) that when it learned of MWV's withdrawal from the joint venture, it had already taken partial delivery of the equipment under the contract, begun installation and was committed to the technology; (5) that BAS has been financially and technologically unable to meet its obligations under the contract; and (6) that both BAS and MWV are liable to it for damages incurred as a result of the failure of the equipment to perform.[1]

BAS responds in its motion for summary judgment (1) that it has fully performed all of its

---

[1] On August 17, 2009, Magistrate Judge Mona Majzoub issued an Opinion an Order granting Plaintiffs' motion for leave to file a Third Amended Complaint, permitting Plaintiffs to add a claim of Fraudulent Inducement against both MWV and BAS. (Dkt. No. 54.) Magistrate Judge Majzoub found that YCUA had only recently discovered, sometime in April, 2009, and confirmed at the April 29, 2009 deposition of MWV employee David Ryan, that MWV and MWVAS knew that MWV was planning to withdraw from MWVAS long before the parties finalized the contract with YCUA, but continued to represent to YCUA that MWV was going to be a part of MWVAS. (Dkt. No. 54, p. 2-3.)

The parties currently have a motion to compel discovery pending before Magistrate Judge Majzoub , based upon matters that arose in the deposition of David Ryan and involving YCUA's claims that MWV has filed an incomplete or non-responsive privilege log. That matter is still pending at the time of this Opinion and Order. This Court finds that YCUA has offered sufficient facts to withstand summary judgment as to each of its claims against MWV and BAS and the fact that discovery is incomplete on the fraudulent inducement claim does not affect this Court's decision.

obligations under the contract and is not liable to YCUA for breach; (2) that it did not fraudulently induce YCUA to enter into the contract because it had no duty to disclose to YCUA MWV's plans to withdraw from MWVAS; (3) that YCUA's claim is barred by the economic loss doctrine and by the statute of frauds; and (4) that any alleged misrepresentations were not material to YCUA, which continued with performance of the contract even after learning of MWV's withdrawal from the LLC, without seeking continuing guarantees from MWV.

MWV responds in its motion for summary judgment (1) that it was not a party to the contract at issue, that MWVAS was not the alter ego of MWV and that it is therefore not liable on the contract; (2) that MWV never promised to guarantee performance of the MWVAS/YCUA contract and that such a claim is barred by the statute of frauds; and (3) that MWV never made false claims about its financial involvement in MWVAS and had no duty to disclose to YCUA its plan to withdraw from MWVAS.

## A.    The Formation and Operation of MWVAS

MWVAS was a joint venture limited liability company created by Defendant MWV and Bioclimatic, Inc., a predecessor in interest to BAS, that was formed on June 27, 2002 "for the purpose of manufacturing and marketing corrosion protection systems and air purification equipment . . . to industrial, commercial, and institutional markets." (MWV Mot. Ex. 1, Art. III, §§ 3.1, 3.2.) MWV had experience with odor control, originating in the paper industry, utilizing carbon activation, and Bioclimatic, Inc. had experience with odor control utilizing air ionization systems. (MWV Mot. Ex. 3, Day Dep. 41:1-8; Pls.'s Ex. 27, Allbaugh Dep. 46:16-48:18; 78:20-79:16.)[2]

---

[2]YCUA offers the same set of 43 exhibits in support of both its response to MWV's motion and its response to BAS's motion.  The Court will cite to all of YCUA's exhibits as "Pls.'s Ex. #."

The management committee of the LLC was comprised of four managers, three selected by MWV and one selected by Bioclimatic, Inc. (MWV Mot. Ex. 1, Art. V, § 5.1(c).) MWV and Bioclimatic, Inc. held 75% and 25% interests in MWVAS respectively. (*Id.* § 1.24.) The management committee, controlled by MWV, had "complete and exclusive control of the management of the LLC's business and affairs. . . ." (*Id*. § 5.2.) Under a related Service Agreement, MWV was responsible for supervision and management of MWVAS and was responsible for hiring, firing and training employees and for maintaining the books and records of MWVAS and for preparing operating plans and budgets. (MWV Mot. Ex. 5 §§ 2B, 2D, 2E). Thus, while the LLC maintained separate accounting records, financial statements, profit and loss statements (MWV Mot. Ex. 6, Ryan Dep. 14:6-11; MWV Mot. Ex. 7, Pohlmann Dep. 60:1-4), MWV was the entity responsible for preparing these records on behalf of the LLC. (Pls.'s Ex. 12.) Also, under the Service Agreement, MWV was to be reimbursed for any costs associated with operating MWVAS only to the extent not in excess of the budget and only for salaries, benefits and travel expenses of certain MWV employees. (MWV Mot. Ex. 5 § 7.) As a result, MWV provided services and incurred costs on behalf of MWVAS that were never reimbursed by the LLC. For example, attorneys provided legal assistance and advice to MWVAS, including in relation to the YCUA contract, that were not necessarily charged back to MWVAS. (Pls.'s Ex. 31, Pohlmann Dep. 11:4-12:4; Pls.'s Ex. 34, Ryan Dep. 22:14-25.) Also, in many instances, former employees of MWV who provided services for MWVAS continued to be paid by MWV. These expenses were supposed to have been charged back to MWVAS, although no documentation to substantiate such cross charges, which would have been generated by MWV, has been offered. (Pls.'s Ex. 31, Pohlmann Dep. 12:19-13:2; MWV Mot. Ex. 7, Pohlmann Dep. 66:13-23.)

4

At the time that the LLC's contract with YCUA was signed in January 2005, significant salaries and benefits were paid by MWV on behalf of MWVAS, and certain amounts due to MWV from MWVAS at the end of 2004 were assumed by MWV. (Pls.'s Ex. 12, p.8.) Losses incurred in 2004 were allocated 96% to MWV and 4% to Bioclimatic. (*Id*.) The LLC agreement specified the contributions made by both of the parties; Bioclimatic, Inc. contributed its entire business (MWV Mot. Ex. 1, Schedule C) and MWV contributed its Corrosion Technology Business. (*Id*. Schedule B.) Additionally, the LLC assumed $364,996.98 in liabilities from Bioclimatic, Inc. (*Id*. Ex. A.)

Throughout the existence of the LLC, MWV maintained insurance on the LLC, at no cost to MWVAS. (Pls.'s Ex. 34, Ryan Dep. 18:15-19:16; Pls.'s Ex. 8, Meadwestvaco Corporation Certificate of Insurance (listing MWVAS as an additional insured)). MWV also hosted and paid all costs associated with the MWVAS website. (Pls.'s Ex. 34, Ryan Dep. 51:1-11.) MWV also paid the costs associated with its corporate controller's review of contracts entered into by MWVAS. (*Id*. 92:15-93:5.) On March 3, 2004, MWV filed a Trademark/Service Mark Application, through its corporate attorney, for the rights to the Mark "Meadwestvaco Air Systems" and to the Meadwestvaco Air Systems logo. (Pls.'s Ex. 21A.) The legend "LLC" does not appear anywhere on the Trademark Application or the associated logo. When announcing its joint venture with Bioclimatic, Inc. in a press release, MWV stated that MWVAS would operate "as part of MeadWestvaco's Specialty Chemicals Division." (*Id*. Ex. 22.)

**B.      Negotiation of the Contract Between YCUA and MWVAS**

In 2004, YCUA was engaged in an expansion of its Ypsilanti Township wastewater treatment plant, increasing plant capacity by 17 million gallons per day at an approximate total project cost of $110 million dollars. (Compl. ¶ 8.) Christman was the general contractor on the

project.  (Compl. ¶ 9.)  As part of the construction project, a YCUA Plant Expansion Project Team ("the Project Team"), comprised of YCUA employees and outside consultants, studied and considered various odor control methods.  (Compl. ¶ 10.)  As originally designed, the odor control system on the project was a "biofilter" system.  (Pls.'s Ex. 36, Thomas Aff. ¶ 3.)  After construction began, YCUA learned of a new odor control system, "air-ionization," that promised equal performance at a lower cost.  (*Id.*)  The Project Team studied the air-ionization system to decide whether plans should be changed to utilize air ionization rather than the biofilter system.  (MWV Mot. Ex. 19.)  In the process of investigating the proposal to change technologies, the Project Team considered at least two different companies that offered the "air ionization" technology, MWVAS and another company called Bentax North America, Inc. ("Bentax").  (*Id.*)

YCUA's first contact with MWVAS was at a March 11, 2004 meeting with Steve Zitin, who had been the majority shareholder of Bioclimatic, Inc. before the formation of MWVAS and who was employed at the time of the meeting with YCUA by MWV.  (BAS Mot. Ex. 2, Zitin Dep. 5:25-6:5; Pls.'s Ex. 33, Zitin Dep. 18:20-19:11.)  The meeting was attended by: Tom Allbaugh (an engineering consultant from Tetra Tech, hired by YCUA to consult on the expansion project, and Project Team member), Jim Grau (Project Team member), Perry Thomas (Project Team member), Walt Zimmerman (from Climate technologies) and Mr. Zitin.  (Pls.'s Ex. 1.)  At that initial meeting, Mr. Zitin explained that MWV was a very large company that had "absorbed" or "merged with" Bioclimatic, Inc. to form MWVAS and that they were interested in providing the equipment for the YCUA job.  (Pls.'s Ex. 1; Pls.'s Ex. 29, Thomas Dep. 27:7-15.)  Mr. Zitin represented the background and capabilities of MWV as an $8 billion dollar a year corporation with over 30,000 employees.  (*Id.*)  Mr. Zitin explained how the merger of MWV with his company improved his

6

company's financial strength and stability, along with enhancing their technology and manpower. (Pls.'s Ex. 35, Grau Aff. ¶ 6.) Mr. Zitin represented that the advantages relating to the merger with MWV were size and strength and the ability of MWV to provide the financial resources for expanded marketing, servicing, research and development. (Pls.'s Ex. 25, Allbaugh Dep. 48:19-49:18.)

On April 13, 2004, YCUA invited both Bentax and MWVAS to Ypsilanti to make formal presentations to the Project Team for the YCUA project. (Pls.'s Ex. 29, Thomas Dep. 34:7-35:10.) Bentax actually had more experience in air ionization, and more experience with waste water treatment plants, than MWVAS, but was a smaller, closely-held, father/son operation. (Pls.'s Ex. 35, Grau Aff. ¶ 7.) The Project Team had doubts about Bentax's financial security and stability which was nowhere near the strength and capability offered by MWVAS. (*Id*; Pls.'s Ex. 2.) There was a concern that Bentax was a risk because of its potential inability to satisfy a money back guarantee on the equipment, which was important to YCUA. (*Id*. ¶ 8.) Because the air ionization technology was so new to YCUA, it was important to the them that the company from whom they purchased the equipment had the financial and technical wherewithal to ensure that they could stick with the project and get it right. (Pls.'s Ex. 25, Allbaugh Dep. 92:25-94:14.)

The Project Team was impressed with the MWVAS presentation and, in particular, with the remarks of Carl Day, a MWV employee who presented at the meeting along with Mr. Zitin. (Pls.'s Ex. 29, Thomas Dep. 38:7-11.) Mr. Day told the Project Team that he was an employee of MWV and that he was there to tell the Project Team about MWV's involvement and interest in the air ionization technology and about MWV's commitment to the YCUA project in particular. (Pls.'s Ex. 35, Grau Aff. ¶ 10.) Mr. Day discussed the money, assets, technical support, scientists and experts

7

that MWV would commit to the YCUA project and highlighted the fact that MWV was backing the project. (*Id*. ¶ 11.)  Mr. Day specifically mentioned that if they were awarded the YCUA contract, they intended to make it a success and to do whatever needed to be done, and specifically to be able to satisfy the "money back guarantee." (*Id*. ¶ 13; Pls.'s Ex. 28, Kang Dep. 25:2-28:4.)  Everyone at the meeting looked to Mr. Day on the issue of the guarantee of the performance of the equipment. (Pls.'s Ex. 29, Thomas Dep. 36:2-14.)  One Project Team member recalls that Mr. Day specifically represented at the April 13, 2004 meeting that if the air ionization equipment didn't work, "they" would buy it back. (*Id*. 37:7-39:9.)  One member of the Project Team, who was skeptical about the air ionization technology, was so impressed by Mr. Day's presentation that he was convinced that YCUA should switch from biofilter technology to the MWVAS air ionization system, because MWV had the assets to support the project. (Pls.'s Ex. 35, Grau Aff. ¶ 14.)

The remarks made that day by representatives of MWV and Mr. Zitin left every member of the Project Team with impression that  they could either deal with this large company that everyone felt had the means to stand behind their product (MWV), or deal with a small company that was a two-man show (Bentax). (Pls.'s Ex. 29, Thomas Dep. 87:1-5.)  Mr. Zitin confirmed that MWVAS was aware that the superior financial strength of MWVAS vis-a-vis Bentax was an important factor to YCUA.  (Pls.'s Resp. Ex. 33, Zitin Dep. 33:17-34:18.)  Specifically, Mr. Zitin testified that he told the Project Team that Bioclimatic had been in business 20 years and MWV for over 100, and that Bentax had been bankrupt 4 or 5 times, and asked the Project Team: "If you have a problem four or five years from now, who are you going to depend on?" (*Id*. 34:8-11.)  Cost was also a factor in consideration, with the MWVAS proposal representing a cost savings both in initial capital expenditure and in ongoing costs of operation and maintenance. (BAS Mot. Ex. 7, Allbaugh Dep.

8

38:8-17; Pls.'s Ex. 27, Allbaugh Dep. 95:12-96:8.)

None of the Project Team members recalls Mr. Day ever mentioning at the presentation the fact that MWVAS was an LLC. They did not understand, and were not told, that they were dealing with an LLC. They never thought they were dealing with anyone other than MWV, the large multi billion dollar company that Mr. Day spoke about at the meeting. They all thought that MWV was guaranteeing performance of the equipment. (Pls.'s Ex. 28, Kang Dep. 39:20-40:14; Pls.'s Ex. 29, Thomas Dep. 40:4-10, 41:19-42:6, 44:12-45:2, 45:16-47:5, 86:15-25; Pls.'s Ex. 35, Grau Aff. ¶ 17.) The message delivered at the April 13, 2004 meeting was that MWV and MWVAS were one in the same, that they were big, and were there to do a great job – no distinction between the two was ever drawn. (Pls.'s Ex. 25, Allbaugh Dep. 53:22-54:8, 57:8-10, 62:17-63:22, 94:15-95:11, 119:17-20, 120:11-22.)

Mr. Day recalls making the power point presentation to YCUA and remembers that he told the group that he was an employee of MWV and that it was an 8 billion dollar company with many employees and capabilities. (Pls.'s Ex. 30, Day Dep. 40:20-41:24.) He recalls that he described the money back guarantee and that this is standard in an equipment contract because "if the customer isn't satisfied, we don't hold them to the [deal]." (*Id*. 43-25-45:9.) Mr. Day also recalls that he mentioned that MWVAS was an LLC and, when informed during his deposition that no one else at the meeting recalled him talking about the LLC status, Mr. Day said he couldn't disagree with their testimony but could only speak to what he thought he had said. (*Id*. 46:13-47:5.)

At the April 13, 2004, presentation, MWVAS handed out several materials in support of its proposal. (Pls.'s Ex. 36, Thomas Aff. ¶ 5.) They included: (1) an "Organizational Capabilities" sheet which reiterates the backing of an $8 billion dollar company and touts the new "comprehensive

strengths of MeadWestvaco Air Systems" with the "[e]ngineering and manufacturing skills to design and build plus the dedication to follow through [to] insure the performance that you need." This organizational material does not mention the fact that MWVAS is an LLC; (Pls.'s Ex. 3); (2) a "Contractor's Qualification Statement" which indicates that MWVAS is a partnership, that its current general partner is MWV, and that it is publicly traded on the NYSE (which Mr. Day admitted in his deposition was an absolutely false statement as to MWVAS, BAS Mot. Ex. 3, Day Dep. 35:21-36:6) (Pls.'s Ex. 4); (3) a "Certificate of Insurance" for MWV which lists MWVAS as an additional insured (Pls.'s Ex. 8), and (4) a sales brochure and several pieces of sales materials, which indicated that MeadWestvaco Air Systems was "a part of the Specialty Chemicals Division of the worldwide MeadWestvaco Corporation" and that they were offering "the only guarantee that doesn't have an expiration date." (Pls.'s Exs. 5, 6.)

On June 2, 2004, Mr. Allbaugh and Mr. Kang placed a telephone call to Mr. Day (joined by Mr. Pohlmann, the new President and GM of MWVAS, also an employee of MWV, who ultimately signed the contract with YCUA on behalf of MWVAS), in which YCUA sought to confirm Mr. Day's level of commitment to the YCUA project and to the industry in general. Day and Pohlmann assured the Project Team members that they were in it for the long haul, and specifically that they were standing behind the performance guarantees. (Pls.'s Ex. 11; Pls.'s Ex. 25, Allbaugh Dep. 50:16-52:23). Mr. Allbuagh's notes from that meeting specifically indicate that MWVAS was an LLC "principally owned by MWV" and the "they will stand behind Indemnity and Performance Guarantee." (Pls.'s Ex. 11.) Day does not recall this conversation. (Pls.'s Ex. 30, Day Dep. 48:23-49:1.) On June 4, 2004 YCUA awarded the contract to MWVAS, although it would be several months before the contract was actually finalized.

10

Mr. Herrygers, Vice President of the Christman Company, the general contractor on the YCUA project, who signed the purchase order for the equipment, testified that he had no involvement in the negotiations and that he was handed documents by Mr. Allbaugh and told to create a purchase order. "Most of the negotiations, if not all of them, were done without Christman being involved. I was given copies of documents and told to use these to write a purchase order, and those documents were all created and reviewed without our involvement." (MWV Mot. Ex. 22, Herrygers Dep. 16:25-17:4.) Included among the documents that Mr. Herrygers testified he never reviewed and had no involvement in negotiating, were the performance guarantee and refund provisions contained in the June 2, 2004 letter from Mr. Zitin to Mr. Kang, written on MWVAS letterhead, with no LLC designation. (*Id.* 19:16-20:7; Pl.'s Ex. 26, Attachment C.)

Mr. Herrygers did testify that he understood that MWVAS was an LLC and that he did not know who MWV was and never asked anyone at MWV for a separate guarantee on the contract. He also testified that he was not told, the day he signed the contract, that MWV had guaranteed anything under the contract. (MWV Mot. Ex. 22, Herrygers Dep. 15:23-25, 16:5-8, 16:23-17:10, 17:11-19:1.) As noted previously, Mr. Herrygers was simply a functionary, asked by YCUA, the true party in interest, to sign the purchase order that formed the basis for the contract with MWVAS. He admitted that he had no involvement in the negotiations and was not familiar with the attachments to the contract. Mr. Herrygers was not involved in the meetings in March and April of 2004 at which Project Team members claim that the LLC status of MWVAS was never mentioned, he was not involved in the June 2, 2004 phone call with Mr. Allbaugh, Mr. Kang, Mr. Day and Mr. Pohlman, and indeed he never met Mr. Day or Mr. Pohlman. (*Id.* 17:19-18:8.) Mr. Herrygers testified that he never had a conversation with anyone about who owned MWVAS and that he had

11

no understanding as to owned them.  (MWV Mot. Ex. 22, Herrygers Dep. 15:7-22.)  This would follow from the fact that he was not involved in the contract negotiations and was not familiar with the additional guarantees that accompanied the purchase order for the equipment that he signed on behalf of YCUA.

> **C.    The Contract Provisions**

The contract was finalized on January 26, 2005 in the form of a signed Purchase Order and Purchase Order Conditions with four attachments (Attachment A: Ionization Equipment Delivery Schedule Dated 1/21/04; Attachment B: Patent Indemnification Agreement Dated 1/14/05; Attachment C: Performance and Corrective Measures Letter Dated 6/2/04; Attachment D: Odor Control Testing Letter Dated 5/2/04).  The Purchase Order states in pertinent part in section 2 that the contract:  "includes technical service for three years of operations, replacement filters for one year of operations, and equipment warranty for a period of twelve months from the date of commissioning (not to exceed 24 months from date of delivery to jobsite)."  Included in the attachments are the following pertinent provisions:

> Purchase Order Conditions . . . (2) Seller represents to Buyer . . . (iii) all goods will be free from all defects and deficiencies and will conform to all requirements of all documents forming this Purchase Order. . . . The term of the warranty shall be one (1) year from the later of the date on which all goods have been delivered and all services have been performed by Seller under this Purchase Order, or the date on which acceptance of any system on the job of which such goods and services are a part has occurred under the Buyer's Contract and Buyer has received payment in full under that Contract.  If any of the goods or services provided by Seller under this Purchase Order fail to perform their intended use properly during the warranty period, Seller shall promptly correct such deficiency in performance (including without limitation providing all labor, materials and other things necessary at the job site and/or the place of manufacture to correct such deficiency) at Seller's sole and exclusive expense.  In no case shall the Seller's warranty extend beyond 24 months from date of Factory shipment.  (Attachment A.)

> *          *          *          *

(2) In the event the performance is deemed unsatisfactory [seller] will have the opportunity to take corrective measures that may include providing additional equipment at our cost. . . .

(3) In the event corrective measures are not deemed satisfactory, the ionization equipment may be returned prepaid in its original condition less normal wear for a credit and refund as applicable.  The filter housings and filters will remain on the project.   This warranty is predicated on the completion of installation, commissioning, testing, and corrective measures within 150 days of factory shipment.  The time required for the manufacturer to complete its work is outside the 150 day period.  In the event, there is no decision on the part of the owner, contractor and/or consulting engineer within the 150 day period the performance will be deemed satisfactory and the equipment accepted as is.  (Attachment C.)

(Pls.'s Ex. 26.)

### D.    MWV's Decision to Pull Out of MWVAS and Failure to Communicate the Decision to YCUA

By the end of 2004, MWVAS was losing money.  (Pls.'s Ex. 30, Day Dep. 62:11-19; Pls.'s Exs. 12, 13).  In September, October and November of 2004 MWVAS was "struggling financially." (Pls.'s Ex. 34, Ryan Dep. 65:4-18.)  Ninety six percent of the 2004 losses were absorbed by MWV. (Pls.'s Ex. 12, p.7.)  On October 18, 2004, the decision was made by MWV to exit MWVAS.  (Pls.'s Ex. 14.)  Day and Pohlmann were both aware of the decision and were part of the ongoing discussions relating to the best exit strategy for MWV.  (*Id.*)  In their initial "action steps" MWV noted specifically the need to consider the "pending" YCUA bid and the potential "exit costs" including legal ramifications.  (*Id.*)  A meeting was scheduled for November 3, 2004 with Mr. Zitin to inform him of the decision of MWV to exit MWVAS.  (*Id.*)  Notes of that November 3, 2004 meeting with Mr. Zitin indicate that MWV was considering several exit options and also chronicled a series of "exit rationales" which included the observation that MWV's "partner's technology" was not scientifically justified.  (Pls.'s Ex. 15, p. 3.)

Thus, during the very time that MWVAS was still actively negotiating the contract with

13

YCUA, and months before the contract was executed on January 26, 2005, MWVAS was planning

to dissolve.  As of October 18, 2004, the decision of MWV to exit the LLC had been made and "the

decision on the intent to withdraw never changed."  (Pls.'s Ex. 34, Ryan Dep. 60:23-61:11.)  By

November 3, 2004, Mr. Zitin was certainly aware of the decision to withdraw.  (*Id*. 62:13-63:6.)  No

one informed YCUA of this decision until long after the contract had been finalized.  Mr. Pohlmann,

who signed the YCUA contract on behalf of MWVAS on January 26, 2005, admitted that he was

involved in meetings discussing MWV's exit from the LLC at the very same time that he was

involved in meetings negotiating the YCUA contract.  (Pls.'s Ex. 31, Pohlmann Dep. 42:15-43:2.)

Mr. Pohlmann admitted that he did not disclose to anyone at YCUA the decision of MWV to

withdraw even though he thought that the information "would have mattered" to YCUA "because

it would change who Bioclimatic was, MWVAS was, at that time." (*Id*. 45:12-46:10.)  Nor did Mr.

Zitin, who was aware of MWV's decision to pull out as early as November 3, 2004, ever disclose

this information to YCUA prior to signing the contract.  (Pls.'s Ex. 33, Zitin Dep. 39:8-14.)  Mr.

Zitin testified that MWV personnel made the decision to have MWVAS sign the YCUA contract

and instructed Mr. Zitin not to discuss with YCUA MWV's decision to withdraw from MWVAS.

(BAS Mot. Ex. 4, Zitin Aff. ¶ 18.)

　　　In August, 2005, Mr. Zitin finally informed YCUA, by email to Mr. Allbaugh, that MWV

had withdrawn from MWVAS and that MWVAS had become BAS and would be continuing to

service the YCUA contract.  (Pls.'s Ex. 18.)  Mr. Allbaugh immediately responded that they needed

to clarify who was going to be responsible for the performance guarantees as these "were offered

through MWV." (*Id.*)  Mr. Allbaugh reiterated that he and Mr. Zitin needed to discuss "MWV's

ultimate warranty/guarantee responsibilities to this project, if necessary, should something untoward

14

come up now that they are no longer affiliated with Bioclimatic." (*Id*.)  Mr. Allbaugh reminded Mr. Zitin that one of the major selling points for YCUA's decision to select MWVAS was the large support capability and financial backing of MWV.  (*Id*.)   Mr. Zitin responded that the warranties and guaranties were not affected by the change in ownership and that MWV had "transferred substantial assets" to Bioclimatic to insure its survival.  (*Id*.)

**E.  YCUA's Continued Performance Under the Contract After MWV's Withdrawal**

At the time that YCUA was notified of MWV's withdrawal from MWVAS, a substantial amount of the equipment had already been shipped, the first pieces arriving in March, 2005 with shipments continuing through July, 2005.  (Pls.'s Ex. 36, Thomas Aff. ¶ 9.)  At that point in time, with YCUA having switched from biofilter technology to air ionization, with the project well advanced and underway, and with the YCUA plant in immediate need of odor control, YCUA had no choice but to proceed with the MWVAS odor control equipment and contract.  (*Id*. ¶ 10.)  Given the importance of the financial strength and stability of MWV to YCUA's decision to go with the air ionization technology, and specifically with MWVAS, YCUA would not have signed the contract with MWVAS in January, 2005 had it known that MWV was going to disaffiliate with MWVAS. (*Id*. ¶ 13.)  BAS states that in fact at the point in time when YCUA learned of MWV's withdrawal from MWVAS (July or August of 2005), only 3 of the 17 pieces of equipment had been installed. (BAS Reply Ex. 15.)  BAS states that YCUA in fact had several options at this point, including demanding a refund under the sunset provision, demanding a guarantee from MWV or continuing with performance which they chose to do.  (BAS Reply 1.)

**F.  Failure of the Equipment to Perform and Failure of Corrective Measures**

YCUA asserts that none of the air ionization equipment ever performed reliably without

15

mechanical or electrical failure.  (Pls.'s Ex. 37, Berry Aff. ¶ 4.)  Under the contract, YCUA was to install the equipment housings and filters and MWVAS was to install the ion tubes; MWVAS was responsible for start-up of the equipment and training (commissioning); YCUA was responsible for testing in the presence of MWVAS; and MWVAS was responsible for making corrective measures. (*Id*. ¶ 6.)

Units were delivered from 3/14/05 to 7/14/05 and with each new delivery and attempted installation and start up, deficiencies were encountered which necessitated modifications and repairs by BAS, thus extending the time frame for corrective measures.  (*Id*. ¶ 5.)  Initial testing occurred on 12/14/05 and revealed a failure to meet contract specifications.  At this time, corrective measures began and continued, without success, throughout 2006 and 2007, causing YCUA to finally conclude, in the summer of 2007, that the equipment would never perform to contract specifications. (*Id*. ¶ 6.)  Beginning with pay application numbers 7 and 8, dated 10/25/05 and 12/25/05 respectively, YCUA began to deny payment because the units did not work.  (*Id*. ¶ 10.)  YCUA ultimately made partial payments on these pay applications because Mr. Zitin claimed that he had run out of money on the project and could not afford to make trips to YCUA to service the units. (*Id*. ¶ 11.)  No further pay applications were submitted and no further payments were made.  (*Id*.)

### G.    Notice of Non-Performance and Return of Equipment Under the 150-day Refund Provision

On August 10, 2007, Mr. Allbaugh sent a letter to Mr. Herrygers of Christman, with copies to MWV and BAS, informing them that the equipment did not and could not meet the contract specifications and that YCUA was intending to return the equipment for a refund, citing the failure of corrective measures. (Pls.'s Ex. 19.)  On August 17, 2007 Mr. Zitin responded, on behalf of BAS, that the refund provision on which Mr. Allbaugh relied expired 150 days after final shipment, and

16

refused the request for return and refund. (*Id*.) On August 17, 2007, Mr. McPartland responded, on behalf of MWV, that BAS was solely responsible on the contract between MWVAS and YCUA, that "[MWV] was merely an investor in a joint venture" and was not a party to, nor obligated on, the contract between MWVAS and YCUA. (*Id*.)

BAS and YCUA agree that under the contract, the 150-day refund provision was to be tolled during any time "required for the manufacturer to complete its work." (BAS Mot. Ex. 4, Zitin Aff. ¶ 7.) YCUA states that installation was a shared responsibility under the contract and that testing and start-up were never finalized due to numerous delays and failures to perform on the part of BAS. (Pls.'s Ex. 37, Berry Aff. ¶¶ 6-9, 13.) YCUA states that all of the work performed by MWVAS/BAS related to installation, start-up, commissioning, repairs, redesign and corrective measures, i.e "manufacturer's work" and never became "warranty work." YCUA states that it is entitled to return the equipment under the 150-day refund provision because BAS' work tolled the running of the refund period. (Pls.'s Ex. 37, Berry Aff. ¶ 13.)

BAS disputes this version of the facts and stats that numerous errors by YCUA staff contributed to the claimed failures to perform and states that specifications were, at least in part, achieved. BAS denies that the equipment was non-conforming and states that errors committed by YCUA staff contributed to the problems with the performance of the equipment. (BAS Reply 1, Exs. 12, 13, 14 and 15.) BAS further states that installation was the responsibility of YCUA. (BAS Reply 2 n.1; BAS Mot. Ex. 4, Zitin Aff. ¶ 6.) BAS states that YCUA had 150 days under the contract to return the equipment, a time limit that was to ensure that BAS would get paid without having to wait for delays caused by YCUA in failing to install the equipment in a timely fashion. (BAS Mot. Ex. 4, Zitin Aff. ¶ 4.) BAS states that the 150-day refund period expired on December

10, 2005 and that nothing done by BAS up to that point had tolled the running of the sunset refund provision. (*Id*. ¶ 9.)

## II.      STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b).   "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, *et al.*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   "The judge is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id*. (citing *Anderson*, *supra* at 249).

Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323 (internal quotations marks omitted); *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact

"would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the non-moving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits , depositions or other factual material, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the  non-moving party to introduce "evidence of evidentiary quality that demonstrates the existence of a genuine issue of material fact." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997). *Anderson*, 477 U.S. at 252. "The mere existence of a scintilla of evidence" will not sustain the non-moving party's burden. "There must be evidence on which a jury could reasonably find for the plaintiff." *Id.*

## III.    ANALYSIS

### A.    Fraudulent Inducement against BAS and MWV

"Fraud in the inducement occurs where a party materially misrepresents future conduct under

19

circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon. Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party." *Samuel D. Begola Servs. Inc. v. Wild Bros.*, 210 Mich. App. 636, 639-640, 534 N.W.2d 217 (1995) (citations omitted).[3] *See also Diamond Computer, supra* at 981 (finding a valid claim of fraudulent inducement where plaintiff offered evidence that SBC made statements that were either not true, or that SBC had no intention of fulfilling).

BAS argues that YCUA's fraudulent inducement claim is barred by the economic loss doctrine. It is well established, however, that a claim of fraud in the inducement represents an exception to the economic loss doctrine, where plaintiff can demonstrate that its fraud claim stands alone, separate from the allegations that support plaintiff's contractual claims. *See Huron Tool and Engineering Co. v. Precision Consulting Servs.*, 209 Mich. App. 365, 372-373, 532 N.W.2d 541 (1995) (recognizing that where the alleged fraudulent statements relate not to the character and quality of the goods but in fact deprive plaintiff of the ability to make an informed decision in choosing to enter into the contract, the economic loss doctrine does not bar the claims).

The alleged misrepresentations in the instant case, set forth in detail above, include:

- MWVAS was backed by an $8 billion dollar company
- MWV stood behind MWVAS
- MWVAS was backed and supported by a research department and a technical group

---

[3] BAS cites *LIAC, Inc. v. Founders Ins. Co.*, 222 Fed. App'x 488 (6th Cir. 2007) and *Tocco v. Tocco*, 409 F. Supp. 2d 816 (E.D. Mich. 2005) for the proposition that a court must find "common indicia" of fraud, such as close familial relationships and one-sided bargaining, before a claim for fraudulent inducement will lie. While both courts consider these factors, they do not in any way require their presence in all cases for a finding of fraudulent inducement. Courts continue to rely on the standard set forth in *Begola, supra*, and do not mention the "common indicia" requirement urged by BAS. *Cf. Diamond Computer Systems, Inc. v. SBC Communications, Inc.,* 424 F. Supp. 2d 970, 981 (E.D. Mich. 2006).

- •     MWVAS was insured by MWV
- •     MWVAS was part of a partnership in which MWV was the only general partner
- •     MWVAS was a publicly traded company on the NYSE
- •     MWVAS was a division of the worldwide MWV
- •     MWV guaranteed performance of the air ionization equipment
- •     An advantage to YCUA in contracting with MWVAS was the financial strength and resources of MWV

None of these statements relates to the quality or character of the goods involved. These statements relate to the character and quality of the contracting parties and, as such, take this claim of fraudulent inducement outside the barrier of the economic loss doctrine.

Further, while BAS and MWV argue that the statements were not untrue when made in April, 2004, this fact is irrelevant when plainly the statements became patently false by virtue of MWV's planned withdrawal from MWVAS, which was known to both MWV, and Mr. Zitin personally, as early as June, 2004 and certainly well before YCUA executed the contract in January 2005.[4] "The general rule is that a party to a business transaction is under an obligation to exercise reasonable care to disclose to the other party, before the transaction is consummated, any subsequently acquired information which he recognizes as rendering untrue, or misleading, previous representations which, when made, were true or believed to be true." *Strand v. Librascope, Inc.*, 197 F. Supp. 743, 754 (E. D. Mich. 1961). While BAS argues that MWV's withdrawal was only a subject of discussion and not a firm plan, there is evidence that the decision was made in October of 2004 and "that intent never changed." (Pls.'s Ex. 34, Ryan Dep. 60:23-61:11.)

---

[4] Not only were BAS and MWV aware of MWV's planned withdrawal at the time they were negotiating the YCUA contract and continuing to accentuate MWV's financial and technological strength, there is also evidence that MWV questioned the "scientific justification" of the Bioclimatic technology. As early as November 4, 2004, and perhaps earlier, MWV considered the fact that Biocliamtic's "technology was not scientifically justified" as one of its rationales for exiting the joint venture. (Pls.'s Ex. 15, p. 3.)

21

BAS and MWV argue, both relying on *Webb v. First of Michigan Corp.*, 195 Mich. App. 470, 491 N.W.2d 851 (1992), that YCUA's reliance on these statements was not reasonable as it had a duty to independently investigate to determine that the corporate structure of MWVAS was such that MWV could back out of the deal at anytime.[5]  In *Webb*, the court held that "there can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant."  195 Mich. App. at 474.  *Webb*, however, was distinguished by the court in *Mable Cleary Trust v. Edward-Marlah Muzyl Trust*, 262 Mich. App. 485, 686 N.W.2d 770 (2004), where the court held that the general rule set forth in *Webb* does not apply where, by reason of the defendant's acts, the plaintiff had no reason to believe that further inquiry was necessary.  The court in *Cleary* noted that the general rule was based upon the premise that a plaintiff was "either presented with the information and chose to ignore it or had some other indication that further inquiry was needed."  262 Mich. App. at 501.  Because defendants in *Cleary* had expressly represented that any development on the lands plaintiffs were purchasing would be in accordance with restrictive covenants, plaintiffs had no reason to question the existence of more than one owner to the mineral rights on the land.  *Id.* at 501-502.  *See also Waun v. Universal Coin Laundry Machine, LLC*, No.

---

[5] BAS argues that there is clear evidence that YCUA knew it was contracting with an LLC and not with MWV, relying principally on the deposition testimony of Mr. Herrygers, a Christman employee, who signed the final version of the purchase order.  BAS and MWV also rely on the "LLC" legend that appeared on some of the MWVAS documents.  Mr. Herrygers did testify that he realized that MWVAS was an LLC and that MWV was not giving any independent guarantees on the contract.  (BAS Mot. Ex. 5, Herrygers Dep.  15:23-25, 16:5-8, 16:23-17:10, 17:11-19:1.)  Mr. Herrygers, however, was not in attendance at any of the meetings where MWV and Mr. Zitin made the representations that form the basis for YCUA's fraud claims.  Nor is there any evidence that Mr. Herrygers shared this knowledge, or its implications, with anyone else at YCUA; he was merely a functionary designated to sign the contract.

267954, 2006 WL 2742007 at * 6 (Mich. Ct. App. Sept. 26, 2006) ("The fact that plaintiff might have ascertained the situation from others is no defense if plaintiff had a right to rely on defendant's representations.")

In the instant case, YCUA argues that it made the importance of MWV's financial and technical support to the deal well known. In fact, YCUA specifically placed a follow-up call to Mr. Day to confirm MWV's commitment to the YCUA project and, in particular, to the performance guarantee. Mr. Day, along with Mr. Pohlmann, confirmed that commitment. MWV points to the fact that Mr. Allbaugh's notes of the June 2, 2004 telephone with Mr. Day and Mr. Pohlmann indicate that MWVAS was "an LLC principally owned by MWV" to support their contention that YCUA therefore knew that MWV didn't actually mean that it stood behind the contract guarantee. But quite the contrary was inferred by Mr. Allbaugh, who interpreted the remarks on the phone that day to mean that the LLC status was not significant because MWVAS was "principally owned" by MWV and that MWV personally and separately stood behind the performance guarantee. MWV offers no evidence to contradict Mr. Allbaugh's impressions – no evidence has been proffered that the remarks made during that phone call informed Mr. Allbaugh and Mr. Kang that MWVAS's LLC status meant that MWV had no legal obligation to follow through on the promises that it was making. Although Mr. Day testified that he did not recall this conversation, this creates a genuine issue of fact as to whether YCUA was obligated to determine that MWV in fact had no legal obligation to stand behind the YCUA project.

That YCUA considered MWV to have personally guaranteed the performance provision is illustrated by Mr. Allbaugh's immediate reaction when he learned that MWV had withdrawn -- to inquire, and ask for assurance, as to MWV's backing of the guarantee which "was offered through

MWV."  (Pls.'s Ex. 18.)  As Mr. Allbaugh testified in his deposition when asked whether he ever thought to have MMV commit in writing to a guarantee: "We thought we had that.  I – I recognize the distinction that you draw . . . in hindsight.  In retrospect, I understand that distinction, but – but the message that was delivered by [MWV] to the Project Team was we're a big company, and we're here to do a great job for you, not – no distinction, whatsoever, about this smaller inseparable entity being involved.  It was we're the big company and we're here to do a great job for you."  (Pls.'s Ex. 27, Allbaugh Dep. 94:21-95:5.)  Plaintiff had a right to, and did, rely on MWV's representations that it stood behind performance of the YCUA/MWVAS contract.  YCUA was not obligated to inquire further.

Finally, BAS and MWV argue that these statements were mere "puffery" or "opinion" and not actionable fraud.  BAS relies on *Sneyd v. Int'l Paper Co*., 142 F. Supp. 2d 819 (E.D. Mich. 2001) to support the proposition that a statement that a corporation is "financially healthy" is mere puffery and not actionable.  *Sneyd*, however, involved the claims of several at-will employees, with no legitimate expectation of continued employment, that they were defrauded by International Paper's statements that the company was financially viable and by the company's failure to disclose to them that they might be selling the unit into which plaintiffs were being hired.  *Id*. at 823.  In this context, the court held, statements boasting of financial health would be mere puffery.  *Id*. at 824.  However, in *Kerry Steel, Inc. et al., v. Friedman, et al.*, No. 49805, 2004 Mich. App. LEXIS 3508 (Mich. Ct. App. December 21, 2004) the court found false statements relating to profitability and financial status to be actionable fraud where plaintiff relied on these statements in shipping steel to CSTC on credit.  The court there held:

> The evidence disclosed that each of the plaintiffs inquired about CSTC's economic status before agreeing to supply steel to CSTC on credit. Thus, the evidence

24

established that Friedman was aware that a positive financial picture was necessary in order to secure credit. . . . For these reasons, we find no clear error in the trial court's determinations that Friedman's representations were made with an intent to deceive plaintiffs, and that plaintiffs actually relied on the representations in deciding to supply steel to CSTC on credit. We similarly conclude that the trial court did not clearly err in finding that plaintiffs' reliance was reasonable.

*Id.* at * 9, 11.

The representations made in the instant case go beyond mere "puffery" about financial health and YCUA's reliance on them was reasonable under the circumstances. By late 2004 both MWV and BAS knew that the resources and financial and technical backing of MWV were soon going to disappear from the picture, leaving BAS a shadow of the entity with whom YCUA thought it was contracting. As Mr. Pohlmann of MWV, who actually signed the YCUA contract, testified in his deposition, the fact that MWV was planning to withdraw from MWVAS and would no longer be in the picture, rendering all of the representations made by MWV and Mr. Zitin false as to MWVAS, "would have mattered" to YCUA because it "would change who Bioclimatic was, MWVAS was, at that time." (Pls.'s Ex. 31, Pohlmann Dep. 42:15-43:2.) Mr. Zitin was also very much aware that the financial strength of MWVAS was critical to YCUA, as he boasted about MWVAS' financial wherewithal as compared to Bentax: "If you have a problem four or five years from now, who are you going to depend on?" (Pls.'s Ex. 33, Zitin Dep. 34:8-11.) Given the explicit nature of the representations relating to financial strength, technological capabilities and the depth of MWVAS' reserves for guaranteeing performance of the YCUA contract, and the critical importance of those facts to YCUA, such statements cannot be considered mere "puffery" or "opinion."[6]

---

[6] MWV continues to press its argument that YCUA pleads silent fraud and must, therefore, establish a duty on the part of MWV to disclose to YCUA. However, this Court previously rejected this argument in its Opinion and Order Granting Plaintiffs' Motion to Amend Complaint (Dkt. No. 54, p. 5), noting that YCUA makes numerous allegations of affirmative representations. YCUA has

YCUA's position that it would not have entered into the contract with MWVAS had it known that MWV was withdrawing from the venture, and YCUA's reasonable reliance on MWV's and BAS' representations that MWV was squarely behind the venture, state a viable claim of fraudulent inducement against BAS and MWV.  There can be no doubt that MWV, if it were a mere partner in a joint venture, would have had every right to conclude that it had made a bad deal, given technology that it questioned and a business partner it did not particularly like, and to withdraw from the venture.  What it did not have a right to do was to accentuate to YCUA, at the very same time it entertained these doubts and planned to back out, that it was 100% behind the project and the technology, knowing that its involvement in the project was a crucial factor to YCUA.  There is evidence in the record, when viewed in the light most favorable to YCUA, that could prove that MWV had no intention of standing behind the YCUA contract at the time that it represented to YCUA that it was fully committed to the project, and that this false representation induced YCUA to enter into the contract with MWVAS.

MWV argues that the damages suffered by YCUA flow not from the alleged fraud but from the non-conforming equipment and that the result in this case would be no different had MWV remained in the venture.  MWV urges the Court to conclude that YCUA would still have equipment that didn't work and would be seeking to recover on the contract.  In asking the Court to consider this scenario, MWV misses a fundamental point of YCUA's claim, i.e. that YCUA would not have entered into the contract in the first instance had it known that MWV was withdrawing.  It may have decided to revert to biofilter technology or it may have decided to go with Bentax or searched for another supplier.  In any case, it argues, it would not now be stuck with over $600,000 dollars worth

offered adequate evidentiary support of those allegations of affirmative misrepresentations.

of non-functioning equipment, a potentially uncollectible defendant and several years without the odor control that it thought it had purchased.  MWV misconstrues the logic of YCUA's claim - the fraud that YCUA claims is not that MWV withdrew, but that MWVAS and MWV misrepresented this fact to YCUA. YCUA has presented sufficient evidence to withstand MWV's and BAS's motions for summary judgment on its fraudulent inducement claim.[7]

### B.      Breach of Contract against BAS

Under Michigan law, the elements of a breach of contract claim are: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).   Both parties rely solely on the language of the contract between MWVAS and YCUA in support of their positions.

BAS argues that shipment of the equipment was complete on July 13, 2005 and that under the warranty language set forth in the Purchase Order (quoted in full in section IC *supra*), any such warranty expired on July 13, 2007.  (BAS Mot. Ex. 4, Zitin Aff. ¶4.)  BAS argues that it completely fulfilled its obligations under the contract by working with YCUA, in the months following delivery

---

[7] MWV also argues that the statute of frauds bars YCUA's fraudulent inducement claim.  However, this Court has already ruled that YCUA plead its claims in tort and therefore the UCC statute of frauds is not controlling.  *See Opinion and Order Granting Plaintiffs' Motion to Amend Complaint*, Dkt. No. 54 at 3. MWV also argues that rescission, the remedy for fraudulent inducement, is not an available remedy as to MWV because MWV is not a party to the contract.  (MWV Mot. 19-20). However, privity of contract is not required to sustain a claim of fraudulent inducement.  *See Oppenhuizen v. Wennerstein*, 2 Mich. App. 288, 294, 139 N.W.2d 765 (1966) (holding that privity of contract is not essential to a claim of fraudulent inducement); *Waun*, *supra*, at *9 n. 11 (recognizing that privity of contract, or even personal dealings, are not required to recover damages for fraudulent inducement).

of the equipment, to take corrective measures aimed at addressing the issues that YCUA claimed

to have with the equipment.  (BAS Mot. 10.)  BAS asserts that after expiration of the 24 month

warranty provision, it had no further obligation whatsoever to YCUA to continue corrective

measures, arguing that the warranty only obligated BAS to address failures of the equipment that

occurred "during the warranty period."  (*Id*.)

YCUA, however, does not consider this to be a warranty issue at all, claiming that the parties

never progressed beyond the start-up and commissioning phase, that BAS was still performing "its

work" under the contract and that the 150-day refund provision (quoted in full in section IC *supra*)

was tolled and never expired.  (Pls.'s Resp. BAS 11-12; Ex. 37, Berry Aff. ¶ 13.)   YCUA argues

that, as the refund provision expressly states, any time taken by BAS to "complete its work" is

outside this 150-day period.  According to YCUA, BAS has never "completed its work," because

all of the work undertaken by BAS over the course of a year and a half constituted start-up,

commissioning and corrective measures (which BAS concedes it was responsible for under the

contract).  Therefore, YCUA argues, the 150-day refund provision has been tolled and remains in

effect and BAS is bound to honor it and accept return of the equipment for a full refund.

YCUA has presented sufficient evidence to create a genuine issue of fact as to whether the

work undertaken by BAS over the course of a year and a half constituted start-up, commissioning

and corrective measures, i.e. "its work" (which tolled the running of 150-day refund provision) or

whether it had completed "its work," the 150-day refund period had expired, and it was performing

"warranty" work, which it was only obligated to perform through July 13, 2007.

### C.    Breach of Contract Against MWV

YCUA's breach of contract claim against MWV, who was not a party to the contract between

28

MWVAS and YCUA, relies on an alter ego/mere instrumentality theory.   YCUA claims that MWVAS was the mere instrumentality of MWV and that, therefore, MWV should be liable on the contract.[8]  In order to move behind the corporate form to impose liability on one company for the actions of another, a plaintiff must demonstrate: "(1) that the corporate entity to be disregarded was a mere instrumentality of another entity; (2) that this corporate entity was used to commit a fraud or wrong; and (3) that the plaintiff suffered an unjust loss." *Tredit Tire & Wheel Co., Inc., v. Regency Conversions, LLC, et al.*, 636 F. Supp. 2d 598, 601 (E.D. Mich. 2009) (citing *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co*., 475 F.3d 783, 798 (6th Cir. 2007)).  "A court's decision  whether to pierce the corporate veil 'is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven.'" *Id.   See also L&R Homes, Inc. v. Jack Christenson Rochester, Inc., et al*., No. 250483, 2005 WL 782696 at * 1 (Mich. Ct. App. April 7, 2005) (unpublished) ("There is no single rule for when the corporate entity may be disregarded. Instead, courts must consider all relevant facts in light of the corporation's economic justification to determine if the corporate form has been abused.").

In its Opinion and Order Denying Defendant Meadwestvaco Corporation's Motion to Dismiss the Second Amended Complaint, this Court held that YCUA had set forth sufficient facts to support its claim of piercing the corporate veil with the allegations that: "[i]n negotiating the contract for MeadWestvaco Air Systems, MeadWestvaco Corporation exercised control of the contractual transaction in a manner that defrauded and wronged Christman and YCUA.  As a result, Christman and YCUA suffered an unjust loss and injury due to MeadWestvaco Corporation's

---

[8] The theory of piercing the corporate veil applies to LLCs in the same way that it applies to corporations. *Travelers Indemnity Co. v. Employers Co*., No. 04-CV-71494, 2006 WL 2457478 at * 8 (E.D. Mich. August 23, 2006).

affirmative representations and conduct." (Dkt. No. 24, p. 6.) The Court noted that MWV's argument that its conduct did not amount to actions that would trigger veil piercing was more suited to summary judgment. The Court concludes that YCUA has sufficiently supported these allegations to withstand summary judgment on its veil piercing claim.

On the issue of mere instrumentality, the court in *Servo*, *supra*, reversed a finding of summary judgment in favor of a parent corporation where the parent corporation had dismantled the subsidiary for its own benefit, absorbed the workforce of the subsidiary, acquired assets of the subsidiary without compensation and placed its own employees in directorships of the subsidiary. 475 F.3d at 798-800. In *Tredit Tire*, *supra*, the court found this first prong satisfied where the WBAH exercised dominion and control over Regency by replacing the company president with its own employee, running the company by making "tactical and strategic decisions" about Regency's business and ultimately making the decision to liquidate Regency altogether. 636 F. Supp. 2d at 602. In *Travelers Indemnity, supra*, the court found that the corporate entities were mere instrumentalities where they did not act without specific instruction from the dominant entity, where the corporate structure was confusingly similar and where the names of the entities were confusingly similar. 2006 WL at * 8.

In the instant case, there are many parallels to *Servo, Tredit Tire* and *Travelers Indemnity.* The LLC operating agreement gave MWV control of the management committee and gave that committee "complete and exclusive control of the management of the LLC's business and affairs of the business." (MWV Mot. Ex. 1, Art. V, §§ 5.1(c), 5.2.) MWV was responsible for hiring, firing and training of employees and for maintaining the books and records of MWVAS. (MWV Mot. Ex. 5, §§ 2B, 2D, 2E.) Many employees of MWVAS, who were former employees of MWV, continued

to be paid by MWV without evidence that these salaries were charged back to the LLC.  MWV absorbed nearly 100% of the losses of the LLC in 2004.  When MWV withdrew from MWVAS, it forbade Mr. Zitin, who admits that he had no input into the decision to withdraw, from continuing to use the name Meadwestvaco, which MWV apparently realized was confusingly similar to Meadwestvaco Corporation.  Accordingly, MWVAS changed its name to BAS.  (MWV Mot. Ex. 2, Zitin Dep. 5:14-6:21.)  Thus, although, as MWV points out, MWVAS was in existence before the YCUA contract was formed, and continued to operate after MWV's withdrawal, it did so under a different name at the direction of MWV.  In essence, MWVAS reverted back to the entity it was before MWV took control and dominated the entity for two years.

MWV relies on *Foodland Distr. v. Al-Naimi*, 220 Mich. App. 453, 559 N.W.2d 379 (1997), for the general proposition that courts generally will distinguish a corporation as being separate from its stockholders.  In fact, however, the court in *Foodland* did pierce the veil, and based its decision in part on a large assumption of debt, such as MWV assumed on behalf of MWVAS in the instant case.  (*Id*. at 457.)  MWV argues that MWVAS maintained a separate corporate identity at all times, observing corporate formalities by holding management committee meetings and operating pursuant to the written operating agreement, although no minutes of such meetings have been offered.  MWV asserts that the "promotional materials" relied on by YCUA in support of its veil-piercing claim are not probative of mere instrumentality.  However, as discussed above, the documents relied on by YCUA in support of its veil piercing claim are much more substantive than "promotional materials:" the Organizational Capabilities sheet, the Contractor's Qualification Statement, the Certificate of Insurance and the Trademark Registration made solely in the name of MWV, all are affirmative statements by MWV that strongly suggest that MWV was much more than "a mere investor" in an

31

LLC.

MWV relies on the opinion of the Second Circuit in *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) where the court declined to pierce the corporate veil where the subsidiary observed corporate formalities, operated on a cash management system, was required to seek the approval of the parent for certain capital expenditures and confused the two entities in promotional materials. *Id*. at 1459-1460. Significantly, however, the Second Circuit found that the parent did not control the subsidiary's board of directors and in fact had only one director on the subsidiary's board. The court concluded that this lack of dominion defeated the veil piercing argument. *Id*. at 1460. By contrast, there is no question in the instant case that, with a 3 to 1 domination on the management committee of MWVAS, and with a Service Agreement that gives the management committee exclusive control over operation of the business, MWV exclusively controlled the business of the LLC. There is also no dispute that the corporate designations MWV and MWVAS were confusingly similar and often not distinguished in promotional literature and verbal representations. Additionally, MWV applied for exclusive trademark rights to the MWVAS mark and logo, was only partially reimbursed for operating expenses incurred on behalf of the LLC, maintained insurance on the LLC at no cost to MWVAS and absorbed 96% of the losses of the LLC in its final year. As the court recognized in *Fletcher*, veil piercing claims are highly fact intensive and the question of domination is generally one of fact. *Id*.

As to the remaining elements necessary to establish a claim of piercing the corporate veil, MWV's utilization of MWVAS to work a fraud on YCUA is outlined in detail above in section III(A), although such a showing is not necessary to pierce the corporate veil. "The [Michigan]

32

Supreme Court, on more than one occasion, has acknowledged that the corporate veil can be pierced in the absence of fraud." *Papo v. Aglo Restaurants*, 149 Mich. App. 285, 302 n.15 (1986) (citing *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 26 N.W.2d 757 (1947); *Fors v. Farrell*, 271 Mich. 358, 260 N.W. 886 (1935); *People ex rel. Attorney General v. Michigan Bell Telephone Co.*, 246 Mich. 198, 224 N.W. 438 (1929)).  Viewing the facts in the light most favorable to YCUA, it has presented sufficient evidence to survive summary judgment on the issue of mere instrumentality.

### D.      Promissory Estoppel Against MWV[9]

To evidence promissory estoppel, a party must demonstrate: (1) there was a promise; (2) the promisor reasonably should have expected the promise to cause the promisee to act in a definite and substantial manner; (3) the promisee did in fact rely on the promise by acting in accordance with its terms; and (4) the promise must be enforced to avoid injustice.  *Novak v. Nationwide Mut. Ins.*, 235 Mich. App. 675, 686-687 (1999).  "Moreover, to support a claim of estoppel, a promise must be definite and clear."  *Kamalnath v. Mercy Mem. Hosp. Corp.*, 194 Mich. App. 543, 552, 487 N.W.2d 499 (1992).

This Court previously held that YCUA alleged a valid claim of promissory estoppel by its allegations that MWV: (1) expressed its intent, plan and commitment to the YCUA project's completion; (2) represented that its significant financial resources and strength were behind the project and would remain; and (3) intentionally accentuated to YCUA its financial resources and strength as a reason for YCUA to select MWVAS as the supplier of air ionization equipment to YCUA.   (Opinion and Order, Dkt. No. 24 p. 7-8.)  This Court refused to dismiss this claim, leaving

---

[9] The Court notes that YCUA may proceed on alternate theories of liability and need not elect between inherently inconsistent claims.  *Aero-Taxi-Rockford, et al. v. General Motors Corp.*, No. 259565, 2006 Mich. App. LEXIS 1777 at * 32-33 (Mich. Ct. App. May 30, 2006).

to the summary judgment stage the question of whether these representations were mere "puffery." (*Id*. at 8.)

As discussed above at length in section III(A), these representations go far beyond mere "puffery" and YCUA reasonably relied on them in choosing to contract with MWVAS to supply air-ionization equipment for the YCUA expansion project. That MWV reasonably expected YCUA to rely on these representations is supported by the testimony of both Mr. Zitin and Mr. Pohlmann, who stated that they believed that MWV's financial strength and technical capabilities were a significant factor to YCUA. That YCUA did in fact rely on these representations is clearly evidenced by the testimony of all of the Project Team members who attended the meetings with Mr. Zitin and Mr. Day and by Mr. Allbaugh's reaction to the announcement that MWV had withdrawn, i.e. we need to talk with MWV about "their" guarantee. While BAS and MWV counter that YCUA continued to perform under the contract even after they were informed of MWV's withdrawal, there is enough evidence to suggest that it may have been difficult, if not impossible, for YCUA to have done otherwise at that point.

There is also no question that these promises, in particular the specific promise made by Mr. Day and Mr. Pohlmann on June 2, 2004, when asked about their commitment to the YCUA project, to stand behind the performance guarantee, were clear and definite enough to sustain YCUA's claim of promissory estoppel. *See Aero-Taxi*, *supra* at * 36-37 (holding that reasonable minds could find that GM's statement that plaintiffs should "not worry" and should continue providing services and that GM would pay them if KH did not, were clear manifestations by GM of an intent to guarantee payment). MWV relies on *Merreo v. McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 442, 505 N.W.2d 275 (1993), to support its claim that MWV's promises were not definite but that case

34

is not persuasive. *Merreo* involved one statement by an employer to an employee, regarding the length of employment, that he "would be taken care of." *Id*. at 444. The court found this simple statement, standing alone, to be insufficient to create a promise of continued, indefinite employment. *Id*. The nature, number and quality of the representations alleged by YCUA easily distinguish this case from *Merreo*. YCUA has sufficiently supported its promissory estoppel allegations to survive MWV's motion for summary judgment. YCUA has created a genuine issue of material fact as whether MWV should be estopped to deny its promise to stand behind the MWVAS/YCUA contract.[10]

## IV.    CONCLUSION

YCUA has created a genuine issue of fact as to whether BAS and MWV fraudulently induced YCUA to enter into the contract in the first instance, whether BAS and MWV breached the YCUA/MWVAS contract, and whether MWV made an independent promise to back the YCUA/MWVAS contract. Accordingly, this Court DENIES MWV's Motion for Summary Judgment and DENIES BAS's Motion for Summary Judgment. This case will proceed to trial on the following claims:

1) Fraudulent Inducement against MWV and BAS

2) Breach of Contract against BAS

3) Alter Ego/Mere Instrumentality (Breach of Contract) against MWV

---

[10] MWV also argues that the UCC statute frauds is a bar to a claim of promissory estoppel in this case. However, this Court has previously noted that this is issue is, at best, unsettled in Michigan. *See KP Bldg. Prods. Inc. v. Ciraulo Bros. Bldg. Co.*, No. 08-CV-11520, 2008 U.S. Dist. LEXIS 104916 at * 25 (E.D. Mich. December 30, 2008). This Court declines to dismiss YCUA's promissory estoppel claim on this basis.

4) Promissory Estoppel against MWV

**IT IS SO ORDERED.**


S/Paul D. Borman                                    
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 23, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 23, 2009.


S/Denise Goodine                                    
Case Manager